WILLIAM LESLIE CRAMER,

*vs.*

LEWES SAND COMPANY, a corporation of the State of Delaware.

*New Castle, Feb.* 10, 1928.

*James I. Boyce*, for the complainant.

*Caleb S. Layton*, of the firm of Marvel, Layton & Morford, for defendant.

THE CHANCELLOR. The defendant concedes that the letter of repudiation warrants the issuance of a permanent injunction as prayed. The decree will direct that such injunction shall issue.

The only question remaining in the case therefore is the sum, if any, which the decree should direct the defendant to pay to the complainant as compensation for past breaches.

The defendant denies all liability for damages because, it contends, it never at any time, either before or since the letter of repudiation, sold sand in violation of its covenant. There is no contention that prior to said letter the defendant violated the terms of its agreement. It is however earnestly insisted that the evidence shows repeated violations since that date. If, as the defendant's officials testify, the defendant continued to abide faithfully by the obligations resting upon it and never knowingly sold sand "to be used in the manufacture of castings and in the iron and steel trade in general," and if as the defendant's president testified, it never purposed to do so, it is rather difficult to understand why the letter of repudiation was written. The explanation given is that the defendant was dissatisfied with the number of orders which the complainant was sending in and, solely as a means of initiating negotiations for a revision of the contract, the letter repudiating the complainant's exclusive rights was written. If this letter had been preceded by some attempt at revision or had been followed up by negotiations, the explanation for it which is now given might claim for itself a better right to be accepted as genuine than it now has. I do not see how this letter can bear any interpretation other than that it meant what it said, viz., that the defendant would no longer consider itself bound by the exclusive feature of the covenant. To entertain the thought that it was consistent with an honest purpose on the defendant's part to still continue a policy of faithful adherence to the contract's obligation, is going far beyond what it seems to me can be reasonably expected. In examining the evidence, I have therefore kept in mind as a fact in the case that the defendant was willing, if its interests so suggested, to ignore its agreement to sell only to the complainant.

It is contended by the complainant that the defendant violated the agreement not only by making sales direct to other dealers than the complainant of sand to be used in the iron and steel trade, but also by making such sales through another corporation known as the Cape Henlopen Sand Company. In examining this contention, the alleged sales by the defendant directly to other

dealers will first be discussed, and then the alleged sales through the Henlopen Company will be considered.

With respect to direct sales by the defendant, the evidence shows them to have been made entirely to one George F. Pettinos. Pettinos was a dealer in sand to be used for the manufacture of castings and in the iron and steel trade generally, and as such was a competitor of the complainant. That that was the sort of sand business which Pettinos was principally engaged in is apparent not alone from the character of his letterheads (foundry facings and supplies—moulding sand and gravel operations), but as well from the form of specially prepared bills of lading which he used, in which his name was printed as consignor and the following printed description of articles to be shipped appears:

> "car of moulding sand
> "(     ) Foundry Facing
> "(     ) Core Compound (     )."

The defendant had notice of these facts. Aside from Pettinos' sign in front of his place of business in Philadelphia, and aside from Pettinos' advertisements of his business in the trade journals (both of which sources of information are not clearly shown to have come under the notice of the defendant), it appears nevertheless quite conclusively that the defendant knew that Pettinos was a dealer in sand to be used for the manufacture of castings and in the iron and steel trade generally. His attempt to order sand from the defendant for use in that trade shows this. The defendant knew also, it is true, that Pettinos was a dealer in sand to be used for other purposes, which were not covered by the complainant's contract. His letterheads, however, and his bills of lading would lead one to believe that the foundry and iron and steel trade constituted the principal field of his operations.

The defendant notified Pettinos that it could not sell sand to him to be used in the iron and steel business because of its contract with the complainant. As showing Pettinos' knowledge of the Cramer contract and his understanding based on notification to that effect that the defendant would not consent to breach it, the defendant has shown how on July 1, 1926, Pettinos ordered from it six cars of core sand and then cancelled the order stating it was sent in error.

The defendant made numerous shipments of sand on order from Pettinos. These shipments fall into two classifications—those which were of sand used in fact for construction purposes and those which were in fact used for foundry purposes. The former, which lay outside the scope of the complainant's contract, were waybilled with Pettinos as the consignor and General Construction Company as consignee; the latter, which were for uses covered by the complainant's exclusive contract, were waybilled with Pettinos as the consignor and himself as consignee at Doylestown, Pa. The waybills were in the form specially prepared for Pettinos' use and the sand was described as "building sand" in all of them except one, in which it was described as "common building sand," the words being typed in below the descriptive language printed in the form above described. There were nineteen cars of sand so shipped and waybilled. All of these cars were diverted by Pettinos and ultimately reached the Central Radiator Company at Lansdale, Pa., a customer of the complainant, for use as foundry sand.

The complainant insists that the defendant must be held liable in damages for these Pettinos to Pettinos shipments. The defendant resists the liability on the ground that it had no reason to know that Pettinos was really selling the sand for foundry purposes. Both parties to the controversy are agreed on the proposition that the liability in damages of the defendant for the shipments now under discussion turns on the question of the good faith of the defendant in filling the Pettinos orders. If the defendant either knew, or by the exercise of a reasonable degree of investigation could have known, that the shipments in question, though on their face not in violation of its contract with the complainant, were nevertheless as a matter of fact in violation of the contract, the defendant should be decreed to pay as damages the loss occasioned thereby. A man cannot enter into an agreement of the character found here and defend himself against a charge of violating it, by showing simply that he notified others that the contract with its inhibitions was in existence and that he would not sell in violation of it, when circumstances exist which would reasonably suggest that inquiry and investigation be made to see if he was being led into breaches of the agreement. When suspicious circumstances do exist, the obligated party, in order to be

relieved of liability, is bound to the active exercise of such degree of dilligence in seeking the facts as will persuade the mind that he is acting in entire good faith towards him to whom he is bound. He is required in the face of such circumstances, to do something more than rest contentedly upon a mere declaration that his contract binds him not to sell to others and that he relies upon such others to see to it that his good faith with his contractee will be protected by them. He owes a duty to be active himself in securing a faithful compliance with his obligation.

This being so, the question arises, are the circumstances such that it can be said the defendant failed to exercise that degree of diligence in connection with the Pettinos to Pettinos shipments which it should have exercised in order to escape liability for the damage to the complainant which those shipments occasioned? My conclusion is that the defendant failed to exercise such diligence. It knew that Pettinos was in the foundry supply business. His letterheads and bill of lading forms showed that, and his correspondence with the defendant also showed that he wanted sand or that business. The naming by Pettinos of himself as both consignor and consignee ought to have aroused the spirit of inquiry in the mind of the defendant in order that the actual destination of the sand could be learned. The defendant, however, made no investigation. It was content to let the mere face of things satisfy its sense of obligation. This indifference to what the true facts might be is in itself enough to warrant a decree for damages based on the Pettinos to Pettinos shipments. When the letter of repudiation however is allowed its coloring effect, it would seem that the defendant was guilty of something more than mere indifference. It looks as though what might otherwise be called indifference was in fact closely bordering on the spirit of active connivance. Damages will be allowed for the Pettinos to Pettinos shipments (nineteen cars as I understand the proof) on the basis of twenty-five dollars a car, the amount of average profit per car which the complainant testifies he lost.

It is now in order to discuss the alleged damage to the complainant by reason of sales said to have been indirectly made by the defendant through the Cape Henlopen Sand Company. The defendant was organized in 1915 and the Henlopen Company in

1921. The two concerns were competitors. Their properties adjoined. The Henlopen Company had a spur track which connected with the defendant's spur track over which the Henlopen Company had to move its cars. The Henlopen Company had to load its sand by hand, possessing no machinery for that purpose as did the defendant. While the Henlopen Company was unable to seriously compete with the defendant in actual sales, yet it was able by mere bidding to force the defendant to scale its prices. In order to protect itself from the Cape Henlopen Company's competition, principally potential, the defendant about January, 1925, acquired a majority of the stock of the Henlopen Company (136 shares out of a total of 146 outstanding). On January 7, 1927, the defendant sold its Cape Henlopen stock to A. M. Lupton who has since been engaged in making it an active company.

Shipments by the Henlopen Company for which the complainant seeks to hold the defendant liable in damages, fall into two classes—those made from the time the defendant acquired its control down to when Lupton bought it in January, 1927, and those made since that date.

It is contended that with respect to shipments made by the Henlopen Company while it was controlled and almost entirely owned by the defendant, they must be regarded as prohibited shipments made by the defendant itself, on the theory that it is not permissible for one, who is under a restrictive covenant, to organize and own a corporation or utilize one already in existence and owned by him, for the purpose of engaging in the forbidden business without incurring liability for damages to the persons for whose benefit the restrictive covenant was framed. This is true. *Kramer, et al. v., Old, et al.*, 119 *N. C.* 1, 25 *S. E.* 813, 34 *L. R. A.* 389, 56 *Am. St. Rep.* 650; 2 *Elliott on Contracts*, § 583.

It does not follow, however, that the sales now under discussion are such as the complainant should be compensated for in damages. Damages for breach of an agreement in restraint of trade are measured by the "loss sustained by the plaintiffs, by reason of the violation by the defendants of their agreement, and not the profits made by the seller." *Scotton v. Wright*, 2 *W. W. Harr.* 192, 121 *A.* 180. In that case one of the items of alleged damage was that the defendants had obtained the agency to sell

Ford automobiles which the plaintiffs claimed they could have obtained but for the breach by the defendants of their covenant not to compete. Upon that phase of the case, the court instructed the jury that no damage could be allowed the plaintiffs for loss of profits on the Ford business unless the securing of the Ford agency by the defendants prevented the plaintiffs from securing it. Applying the principle which underlies that ruling to this case, the complainant cannot be allowed damages for the sales made by the Henlopen Company prior to January, 1927, unless it satisfactorily appears that such sales by the Henlopen Company prevented the complainant from securing them. The evidence fails entirely to show anything upon which to base so much as an inference that the complainant lost the sales referred to by reason of the Henlopen Company's making them. Those sales were made to concerns with which the complainant had theretofore unsuccessfully tried to do business. If the Henlopen Company had not made them, the complainant, it is reasonable to assume, would in all likelihood have continued to solicit them in the future as unsuccessfully as in the past. The evidence shows that competition from localities other than Lewes had in some instances at least prevented the complainant from making sales to the concerns to which the Henlopen Company made shipments in the period referred to. The fact that the Henlopen Company made sales of sand, even though such sales are attributable to the defendant, cannot alone signify damages to the complainant because, as indicated in *Scotton v. Wright, supra.* profits made by the defendant are not a measure of the plaintiff's damage unless the plaintiff in the absence of the competition would have secured them. On the question of whether the sales by the Henlopen Company in the period prior to January 7, 1927, were such as to damage the complainant, the testimony of the complainant himself is conclusive of the matter, for in testifying concerning the extent of the damage which he had suffered he specifically testified that it covered the business with four concerns only, naming them, and that the Chancellor need pay no attention to the great multitude of transactions with other concerns with which the record was laden, in which class all the Henlopen Company's shipments prior to January, 1927, fall. The complainant's solicitor argues in the face of this statement of the

complainant himself that damages ought nevertheless to be allowed for these other sales. If there were a conflict between the views of solicitor and client touching the significance of a situation from the standpoint of what is its legal result, the solicitor's views rather than the client's ought perhaps, in the absence of an estoppel or waiver, to be taken by the court as presenting the issue, but where as here the question is solely one of fact, viz., whether certain competition has damaged a business, I think that the proprietor of that business is better qualified to speak than is his solicitor, and his views should mark the boundaries of his claim. This being so, I conclude that the shipments made by the Henlopen Company down to January 7, 1927, to concerns which the complainant himself has expressly declared are not to be reckoned with in appraising his damages, should be ignored.

We now come to the shipments made by the Henlopen Company since January 7, 1927, the date when the defendant sold its entire stock holdings in that company to Lupton. In so far as these shipments went to concerns other than the four specifically mentioned by the complainant in his testimony, they fall in the same category as those last discussed, and are for the reasons before given to be ignored as a factor in the claim for damages.

There are something like fifty carloads of sand which the Henlopen Company sold to Pettinos since January 7, 1927—forty-nine cars went to Republic Boiler & Radiator Company and one to Central Radiator Company, the consignees named in the bills of lading, for use in the iron and steel trade. These concerns were customers of the complainant and the sand that thus went to them may be regarded as sand which Pettinos sold to the damage of the complainant's business. The question arises therefore whether the defendant should be held pecuniarily liable to the complainant for the loss by him of the business represented by these shipments.

Before answering that question, it should be stated that there is nothing in the record to justify any view other than that the defendant made a bona fide sale of its Henlopen Company's stock on January 7, 1927, and that since that date it has had no part of any kind in managing or controlling the Henlopen Company's affairs. It is in no wise interested, directly or indirectly, in the profits, the success or failure of that enterprise, nor are any of its

stockholders so interested. The situation is one where the defendant bought the Henlopen Company's stock to get rid of a competitor and after a time sold the stock to Lupton. It thereby, of course, made it possible for the Henlopen Company in the control of its new management to set out again upon a career of competition. If this were the end of the matter, it would seem to be quite clear that the defendant in thus selling its stock control of the Henlopen Company did nothing in breach of its agreement with the complainant, for the extent of its obligation was to abstain from selling or soliciting sales of sand to be used for castings, etc. We are dealing with a covenant and are of course limited to the language of the covenant in ascertaining the mutual rights and obligations of the parties to it. There is nothing in that language which either expressly or by fair implication can be said to require the defendant to do anything in the way of warding off competition from itself, and indirectly from the complainant. If the defendant was not bound to acquire the Henlopen Company's stock in the first instance (at a date subsequent to when the complainant's agreement had been entered into), it is difficult to see why it should be bound, having acquired the control, to retain it. The situation, in so far as the effect of the Henlopen Company upon it is concerned, is the same today as it was when the complainant's contract with the defendant was entered into.

But, the complainant argues, the evidence shows that the defendant loads sand (which in the Republic Boiler and Central Radiator cases was used for foundry purposes to the damage of the complainant) for the Henlopen Company at thirty cents a ton, and according to the undisputed evidence makes a profit in the doing of this work of ten cents a ton. This is true. How that, however, can be said to constitute a breach of the defendant's contract with the complainant not to sell its sand for foundry uses, I am at a loss to see. If the loading by the defendant of Cape Henlopen Company's sand were for a price that justified the conclusion that after all it was but a devious device for the defendant in the interest of its own profit to get rid of its covenant with the defendant, the Henlopen Company playing the role of a mere tool in the fraud, the matter might appear in an entirely different light. To the extent the defendant loads sand for the Henlopen Company

at ten cents a ton profit on its work, which sand, but for the Henlopen Company, the complainant would buy from the defendant at fifty cents a ton, it would appear that the defendant, rather than benefiting at the complainant's expense, would be a serious loser, for the quantity of available sand being great and the cost of loading being only twenty cents a ton, it is apparent that the defendant would be much better off if the complainant instead of the Henlopen Company's vendee could get the business. I do not see why the defendant may not be allowed to do loading work for the Henlopen Company at what appears to be a modest profit, when that company will in all probability either itself load its cars or hire another person in the defendant's stead. There is nothing in the language of the covenant which prohibits the defendant from having business relations with a competitor, even though those relations may make it in part possible for such competitor's customers to under-sell the defendant's covenantee, nor should the law read any such thing into the covenant unless a fraudulent purpose to circumvent the covenant's obligation somewhere appears. I cannot discover such fraudulent purpose under the facts disclosed in this case. Even in those cases where the covenant is broader than this one, namely, in those cases where a party selling a business covenants not to engage in such business, it has been held that the party bound may under some circumstances be employed in the business by a competitor, and may without breach of covenant lend money to or supply a building for another who is competing in business with his vendee. Unless I am prepared to hold, as I am not, that when the defendant engaged not to sell in competition with the complainant, it bound itself to have no business intercourse resulting in gain to itself with another who sells to competitors of the complainant, if that intercourse makes it in any wise possible for the competitor to get business, I shall have to conclude this branch of the case against the complainant. Viewing the sale of the Henlopen Company's stock to Lupton as a bona fide one, without reservations of any kind, which the defendant was as free to make as it was never to acquire the stock, and seeing nothing in the employment by the Henlopen Company of the defendant to load cars which indicates a subterfuge or fraudulent design against the complainant's business, I accordingly refuse

to allow damages because of the Henlopen Company's sale to Pettinos of the fifty cars of sand referred to.

There are two other small items of damage which the complainant specifies. These have to do with loss occasioned by price-cuts on sand sold by him to Deemer Steel Casting Company and William Wharton, Jr., Incorporated, which cuts were made necessary by competitive bidding. That the complainant had competition from New Jersey appears from the testimony. Whether the bidding which forced price-cuts in the complainant's business with the two companies mentioned came from New Jersey or from the defendant, or where, does not appear. It would not be permissible on this showing of the evidence to conclude that the defendant was responsible for the loss in question.

Let a decree be prepared in accordance with the foregoing, costs on the defendant.