JOHNS-MANVILLE CORPORATION, a corporation created by and existing under the laws of the State of New York and a citizen and resident of said State,

*vs.*

AMERICAN HAIR & FELT COMPANY, a corporation created by and existing under the laws of the State of Delaware and a citizen and resident of said State.

*New Castle, Dec.* 28, 1931.

*Caleb S. Layton,* of the firm of Richards, Layton & Finger, and *Henry C. Alexander,* of New York City, for complainant.

*Hugh M. Morris,* and *Louis Quarles* and *Leo Mann,* both of Milwaukee, Wis., for defendant.

THE CHANCELLOR: It is conceded that the contract will be terminated by virtue of a breach and notice given under paragraph twelve thereof, on February 18, 1932. The defendant, however, insists in its answer and affidavits that there has been a breach also of paragraph five of the contract entitling it to terminate the contract on thirty days' notice; and that, notice of termination under paragraph five having been given on October 15, 1931, the complainant since November 15, 1931, no longer has the right to serve as the defendant's exclusive sales agent. The complainant insists by its bill and affidavits that there has been no breach under paragraph five and that on the authority of *Cramer v. Lewes Sand Co.*, 15 *Del. Ch.* 329, 138 *A.* 78; *Id.* 16 *Del. Ch.* 66, 140 *A.* 803, it is entitled to a preliminary injunction restraining the defendant from violating the contract by refusing to recognize the complainant's rights as exclusive sales agent.

Paragraph five, upon which the controversy turns, is as follows:

"5. If Johns-Manville shall follow a persistent course of selling any of said Ozite Standard Hair·Felt at higher prices than those designated by the Manufacturer, such course of action shall constitute a breach of this contract for which the Manufacturer may, at its option terminate this Agreement by giving thirty days written notice to Johns-Manville."

The defendant claims and the complainant admits that sales were made by the complainant "at higher prices than those designated by the manufacturer (the defendant)." Upon the question of whether such sales disclose "a persistent course of selling," the parties are in pronounced disagreement. That is the question and the only one which the present rule calls upon me to decide.

It is shown by undisputed evidence that on a selected list of total sales made by the complainant to ten customers which should have aggregated a cost to them of $22,899.99, the complainant charged $26,325.46, and that as a result thereof the complainant received a compensation of $4,-

715.46, whereas if the prices designated by the defendant had been adhered to, the complainant would have received only $2,289.99, being the ten per cent. commission allowed by the contract to the complainant on sales made by it. The orders on which this overcharge occurred are twenty-three in number.

The complainant admits that altogether, so far as its investigation reveals, its total over-pricing amounts to about $3700.00 out of an aggregate of sales of $360,000 made by the complainant from November 18, 1930, to September 30, 1931. Inasmuch as the total overcharge went to increase the complainant's compensation, it is evident that the complainant received by way of overcharge $3700.00 more than its specified commission of ten per cent. would amount to.

The complainant attributes the over-pricing to errors on its part, which are explicable on the ground of honest mistakes, and it earnestly insists that in no sense can it be said that the instances in which it charged the higher prices disclose the following by it of a persistent course of selling above the price schedule designated by the defendant.

When this suggestion was made at the argument I was rather favorably impressed by it. A closer examination of the affidavits compels me however to seriously question the soundness of the first impression. The complainant's attempt to reconcile the overcharges with honest mistakes, is based on what it contends is the intricate classifications and resultant list prices and varying discounts which the defendant's schedule of designated prices sets up and the consequent likelihood of error in applying the same. This would be more convincing if it were not for the fact that as the defendant received orders from the complainant for shipment to the latter's customers, the practice was for the defendant to make out an invoice and forward it to the complainant, showing the price and the allowable discount. The over-charges were effected by the complainant's allowing too little discount. If, for instance, the complainant

settled with the defendant at the list price, forty per cent. off, and billed the customer at the list price, twenty-five per cent. off, the customer would be overcharged and the complainant would profit to the extent of the overcharge.

Now inasmuch as it was the usual practice of the complainant to await the receipt of invoice from the defendant before billing the customer, it is difficult to understand how the complainant could escape observing the discount stated on the defendant's invoice and noticing its discrepancy with the complainant's own order sheet showing a smaller discount. Especially is this so when the complainant admits that its own order slip was compared with and checked against the defendant's invoice for discovery of errors in particulars other than in those of the discount rate, before the customer was billed. It is to be noted that not only did this comparing of the complainant's orders with the defendant's invoices take place under the usual practice in the division offices of the complainant, but a further opportunity for comparison was afforded in the complainant's central office in New York, to which the complainant's invoice to the customer, showing the discount, and the defendant's invoice to the complainant, showing its statement of the discount, were sent. Thus two checking points existed, at either of which the complainant's scaling of the scheduled discounts ought to have been discovered by it. I repeat that it is difficult to understand why the complainant failed to catch these overcharges which it calls mere honest mistakes.

Notwithstanding the difficulty of understanding this, it might still be possible so far to favor an indulgence to error in handling details as to allow it to reconcile the alleged mistakes with a *bona fides* of intent. But there is a letter in evidence which has not been satisfactorily explained, and which has the effect upon my mind of causing me seriously to question whether the overcharges in question were due to honest mistake or purposeful design. That letter, addressed by a vice-president of the complainant to the Chicago sales division office, was as follows:

"*Personal & confidential*

"Mr. T. O'Leary, Jr.,

"7449 North Hoyne Avenue,

"Chicago, Illinois

"Dear Tom: *Hair Felt Contracts—1930*

"This is a very personal and confidential matter, but I want you to immediately prepare the figures for me on the following accounts. I am working today with Mr. W. N. Allman, Office Manager, in trying to get out to all of our Division Managers the new arrangement that will be in effect with the American Hair & Felt Company as of November 18, 1930.

"As you probably know, I have closed the contract for another five years' period, beginning on that particular date, and one that I am sure is entirely satisfactory to our Corporation as a whole and particularly the Transportation and Government Department. It means of course that as of that date there is a very definite responsibility of our Division Transportation and Government Managers, and when you are here in New York at the Railway Business Association meeting, I will then have a chance of talking with all of you with reference to just exactly what I have in mind, but something that you must prepare for me immediately can be outlined as follows. Mr. Allman has given me the data as to the contracts that you have in effect in 1930 on Hair Felt, and I find the following, and will comment on same under the headings of the various companies with whom contracts are held:

"*Swift & Company*

"We find that you are using the old list. Your cost on this material is 25% discount and you sell it at 20% discount. Have you tried to substitute the new list? What has been your volume so far this year?

"*Important:*

"*General American Tank Car Corporation*

"This is the new list, but you have a cost of 30% and a selling price of 25%. What is the volume?

"*Cudahy Packing*

"This is another case of where you used the old list. Your cost is 25% and your selling price 20%.

"*Chicago & North Company*

"This is the new list. Your cost is 30% and your selling price 25%. What is the volume?"

*"Armour & Company*
"This is the old list with a cost of 25% and a selling price of 22-1/2%.

"In the new contract I am accepting the agency arrangement on Standard Hair Felt which involves a 10% commission on all sales, and of course under the proviso it would be impossible for us to sell this material at other than the dictated prices by the American Hair & Felt Company.

"You realize that your commission this year was 6%, but you did have this added profit. Looking at it today, I realize that in order to conform strictly with the contract as written, it would be necessary to revise our prices beginning with the first of the year to the accounts as listed. In other words, this would be a reduction in price and profit, even considering the 10% commission.

"You have noticed the important question I have asked and that was the volume, as that will be one of the deciding factors with me in telling you just exactly what to do, but have these figures tabulated as quickly as possible and sent on to me, as in the new contract there will be a recapture clause that would involve us seriously and I do not want to take any chances.

"Do not keep this letter in your files; but take and destroy it, and take from same enough pencil memorandums so that you can let me have the information that I require. Do not keep a copy of letter that you write to me, and I will destroy yours just as soon as I have taken the memorandum that I want from same.

"George A. Nicol
"[Signed] G. A. N.
Vice President."

"GAN:S

Why there was such an extreme precaution taken to assure secrecy concerning the letter's contents, I find it difficult to understand. The writer expressly states that he wants the requested sales data in hand before meeting the recipient for a personal conference, because the important matter of volume of sales to certain customers who had theretofore been allowed a less favorable discount than the price schedule specified (by means whereof the complainant had received an "added profit"), was one of the deciding factors with the writer in telling the recipient just exactly what to do under the new contract. In view of the fact that the topic with which the writer was dealing was the inauguration of the price schedules to be charged under

'the new contract, I cannot possibly see how there could be any factor entering into the matter of deciding upon instructions to sales managers other than the terms of the price schedule furnished by the defendant. That schedule was the fixed rule for the complainant's guidance. The only thing that I can see that the complainant needed to consider as a factor in telling its sales managers "just exactly what to do" was the factor of the schedule's contents. What bearing past volume and discounts and past "added profits" could have upon the sort of advice that should be given under the circumstances it is impossible for me to see.

An explanation for the letter that is offered by the complainant as showing its absolute innocence is that it was only a request for information as an aid to the writer of it in the making of "a normal and business decision which the writer was called upon to make in determining the most advisable manner, from a selling and business standpoint, of presenting to the complainant's customers a change in prices due entirely to a new contract which had" just been entered into. The letter may be susceptible of this explanation. Unfortunately, however, I am unable to so regard it. It seems to me that there was no serious business problem in having to advise customers of a new price schedule which, I understand, meant lower prices to them occasioned in part at least by more generous discounts.

It is further suggested that the desire for great secrecy was due to the fact that there were two customers of the complainant who, by arrangement between the complainant and defendant, were to continue to receive, as they had in the past, a better price quotation than the general schedule allowed, and hence arose the desire that the letter and the response thereto should be destroyed. This can hardly be, however, because I observe that the letter inquires about the volume of sales to concerns other than the two in question.

When it is considered that *uberrima fides* is exacted of

one who acts as the exclusive sales agent of another, the court should not strain itself to remove from circumstances the damaging inferences which the appearance of things reasonably indicates, when ample opportunity has been afforded to those concerned to make a satisfactory explanation. While I hesitate at this stage to say that the complainant has been guilty of following a persistent course of selling at higher than the permitted prices, yet I am bound to say that the weight of the evidence before me sufficiently demonstrates it so as to make me feel that a preliminary injunction should not issue and thereby insure to the complainant the enjoyment of its contract for the month and a half yet remaining of its life. If the preliminary injunction were to issue, it would in effect constitute final relief.

Of course overcharges made as a result of honest mistakes would not show the following of a persistent course of overcharging. The phrase in the contract imports deliberation. One deliberate overcharge doubtless would not be indicative of a course, much less a persistent one. How many such overcharges need be shown in order to satisfy the phrase "persistent course" would depend on circumstances. I take it that a persistent course of overcharging might be evidenced by occasional overcharges deliberately slipped in at intervals in the course of the dealings. The overcharges in this case are sufficiently numerous to indicate that, unless they were innocently made, a persistent course would be revealed. The more often an error is repeated, the less reason there is to attribute it to a lack of design. In this case, as before indicated, the happening of the overcharges in face of two opportunities to discover them by a system of checking, coupled with the letter above quoted with its adverse implications, are calculated to induce the mind to resolve the overcharges adversely to the complainant. If this result is unjust to the complainant, it is unfortunate for it that the evidence before me is of the character it is.

The rule will be discharged and the restraining order now outstanding vacated.